**FILED**
**June 20, 2018**
**8:00 AM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Jeffrey D. Wallis | ) | Docket No.  2017-08-0772 |
| | ) | |
| v. | ) | State File No. 2656-2017 |
| | ) | |
| Baptist Memorial Hospital, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Allen Phillips, Judge | ) | |

---

### Affirmed and Remanded – Filed June 20, 2018

---

In this interlocutory appeal the employee, a patient care assistant, alleged suffering a low back injury when a patient he was assisting became limp, requiring him to support the patient until a chair could be placed under the patient.  The employer initially accepted the injury as compensable, but later denied the claim when the authorized treating physician opined that the employee's condition was not caused by the work incident.  Following an expedited hearing, the trial court concluded that the employee presented sufficient evidence to rebut the statutory presumption of correctness applicable to the treating physician's causation opinion and to establish he is likely to prevail at trial.  The court ordered ongoing medical benefits and temporary disability benefits.  The employer has appealed.  We affirm the decision of the trial court and remand the case.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, and Judge Timothy W. Conner joined.

J. Matthew Kirby and Pablo Varela, Memphis, Tennessee, for the employer-appellant, Baptist Memorial Hospital

Jeffrey D. Wallis, Southaven, Mississippi, employee-appellee, pro se

### Factual and Procedural Background

Jeffrey Wallis ("Employee"), a fifty-two-year-old resident of Desoto County, Mississippi, worked as a patient care assistant for Baptist Memorial Hospital ("Employer") in Memphis, Tennessee.  He alleges that on January 8, 2017, he suffered an injury to his low back when a patient he was assisting "went limp," requiring him to

support the weight of the patient until a nurse could place a chair under the patient. Employee testified that "a couple of minutes later my back was pulsating like you had stuck me with an ice pick." He reported to Employer's emergency room where he was diagnosed with low back pain with left-sided sciatica. X-rays revealed a previous fusion at L5-S1, but no evidence of fracture was indicated or "acute osseous injury appreciated."[1] Two days later, Employee sought additional treatment at Employer's emergency room, reporting that his back pain was "rapidly worsening" with radiating pain to his "left foot, left thigh and left knee." Additional x-rays revealed "no acute findings."

When Employee's condition failed to improve, Employer offered him a panel of physicians from which he selected Dr. James Varner, an orthopedic surgeon. After examining Employee, Dr. Varner diagnosed a lumbar strain with left sciatica and ordered an MRI. At Employee's visit following the MRI, Dr. Varner noted that the recent MRI was "compared to MRIs from 2006 and 2008." His report stated that Employee "has a well-consolidated fusion with reduction of his spondylolisthesis at L5-S1," and also noted "a mild disc bulge [at] L4-5 without stenosis." Dr. Varner ordered physical therapy. Employee returned to Dr. Varner after four physical therapy sessions and reported little improvement. Dr. Varner recommended Employee continue physical therapy and indicated that if Employee's symptoms continued, a "spine surgery referral may be of necessity." Employee returned to Dr. Varner after completing physical therapy and reported continuing low back pain and pain in his "left buttock, thigh, and occasionally the proximal left calf." Dr. Varner recommended a "spine surgery assessment to determine whether any additional workup or treatment is warranted."

Employee selected Dr. Laverne Lovell, a neurosurgeon, from a panel of physicians Employer provided for the surgery assessment. At the initial visit, Dr. Lovell had the recent MRI available, but did not have the x-rays obtained in Dr. Varner's office. His report notes that he "can't tell whether [Employee] has a solid fusion or not." Dr. Lovell recommended an L4-5 epidural steroid injection and continued the light duty work restrictions Dr. Varner had assigned, adding that he would "attempt to get the plain x-rays from Dr. Varner's office to look at the hardware and fusion at L5-S1."

When Employee returned to Dr. Lovell following the steroid injection, he reported experiencing one to two days of relief, stating that he immediately started taking pain medication after the injection. Dr. Lovell stated in his report that "it is not clear to me that he got as much relief from the block as he thinks he did and I am not sure he got any relief from it if he was taking [pain medication] after the block." Dr. Lovell noted he was "unable to confirm fusion on his plain x-rays," and stated "[h]is MRI scan does not show a certain reason why the patient should be having his back [pain] and now what he

---

[1] Employee had undergone a lumbar fusion in 2008.

describes as S1 radicular pain." Dr. Lovell ordered a CT scan "to confirm or rule out fusion at L5-S1," also stating:

> If the patient has a non-union at that level, then my recommendation would be to take him back to surgery to complete the fusion and basically do a repeat operation at that level. If the patient has a clear cut fusion at L5-S1, then I would recommend taking out his hardware. . . . I have told the patient if he is not fused, then he will need to return back to me for a more lengthy discussion. . . .
>
> We will remove hardware if the patient is clearly fused.

The initial report of the CT scan noted "posterior screw and rod fixation at L5-S1," stating also "[t]here is no hardware fracture or loosening. There is no acute fracture or subluxation of the lumbar spine." Additionally, the report noted "moderate/severe left neural foraminal stenosis with possible impingement of the exiting left L5 nerve root, not significantly changed compared to prior MRI." An addendum to the report stated "[t]he L5-S1 disc space is partially obscured by artifact. There is possible mild osseous fusion across the anterior and posterior disc space at L5-S1. There are small bridging osteophytes along the bilateral posterolateral corners. There is no osseous fusion of the posterior elements."

When Employee returned to Dr. Lovell following the CT study, Dr. Lovell noted that he "personally [didn't] think [Employee] is fused across the disc space." Noting that he had radiology "look at that closely and give me their opinion," Dr. Lovell stated that "[a]ll they could say is that there are possibly some little bits of bridging bone posteriorly." He stated in the report, "I see the spot that they are talking about but frankly I don't think the CT scan is good enough technically as an image to tell me that he is fused." Dr. Lovell's report indicated he discussed the study with Employee and thought Employee's situation stemmed primarily from the 2008 surgery. Dr. Lovell explained:

> I have gone over this with the patient. It is an odd scenario and I understand that completely. The patient feels like he has to be fused since his surgery was done in 2008 and he supposedly had no symptoms until this work injury. I understand his feelings about that but a fibrous non-union, I think, will eventually become symptomatic for a patient as time goes by and it has just taken him a lot longer period of time. I don't deny that there was increase or occurrence of symptoms with this episode at work. I just think way more than 50% of his problem stems around a fibrous non-union from a surgery done eight years ago . . . .

Accordingly, Dr. Lovell recommended that Employee return to Dr. Camillo, who performed the 2008 surgery, adding that "[i]f the patient wants me to care for him, it will be under his regular insurance . . . ."

Employee returned to Dr. Camillo on June 5, 2017. Dr. Camillo noted the 2008 surgery and fusion, stating that he had not seen Employee "in quite some time." He noted Employee's report of the January 8, 2017 work incident and the back pain and left leg pain Employee had experienced since the incident. He stated in his report that when he reviewed the CT scan "it looks like he does have a broken screw down at L5-S1," noting "[t]he screw is broken on the right side." He additionally stated that, in looking at x-rays taken that day in his office, he could "see where the screw is broken, but other than that . . . no abnormalities." He concluded that Employee had "an injury to his back on January 8 when he leaned forward when he was holding a patient and the patient lost strength." His report additionally stated:

> [Employee] had a pseudoasrthrosis, but his pain was fine until this happened now, and when I look at his x-rays and I look back at his old x-rays he has a broken screw. What I believe is he had a pseudoarthrosis[.] I believe when he was holding the patient more than likely he fatigued the screw, and it broke, and now this is the increase in his pain in his back. . . . I do believe that this was due to his work injury.

Dr. Camillo discussed performing a revision surgery in which he would "remove the screw and lay bone graft down."

In October 2017, Dr. Lovell reviewed Dr. Camillo's clinic notes and the x-rays Dr. Camillo obtained. He then reviewed Employee's other recent diagnostic studies and "did not see broken screws at that time." He noted that Dr. Camillo's "plain films show the broken screw," and stated "[w]hen a patient has a lumbar fusion and has a non-union, they eventually do break through screws regardless of what activity they are involved in." Dr. Lovell additionally stated that he "would not consider in any way, shape or form a broken screw and non-union from a previous operation to be related to any kind of work incident," adding that broken screws "can happen for no reason and for any reason and I will not relate that to a work injury." He concluded "[i]t is wholly related to his prior surgical intervention having failed to achieve fusion," and for that reason he "would recommend that [Employee] be treated under his regular insurance."

However, Dr. Lovell stated in this report that "[i]t is not clear to me whether my previous studies just weren't in correct focus or alignment to show this screw fracture and Dr. Camillo's study happened to be in a proper alignment[,] or if the patient actually broke the screw after he saw me and prior to seeing Dr. Camillo." He added that a "CT scan generally will be the best study and will show a screw fracture and the CT scan that I performed on the patient does not show that." He concluded, "[f]or that reason, I would

4

go on record suggesting that the patient did not have a broken screw when I saw him and that screw fracture[d] between my clinic visit and Dr. Camillo's visit and once again, that would not be related to a work injury."

At the expedited hearing, Employer introduced a March 2018 affidavit of Dr. Lovell stating he had reviewed "Dr. Camillo's June 5, 2017, notes and x-rays," and that he agreed "the June 5, 2017, x-rays show a broken screw on the right side of the fusion hardware." The affidavit stated "[t]his broken screw was not present when I last saw [Employee] on April 27, 2017"; that the "right-sided broken screw would not explain [Employee's] left-sided symptoms"; and that it was his opinion that the screw "broke between [Employee's] last visit in [his] office on April 27, 2017, and his visit to Dr. Camillo on June 5, 2017." Further, the affidavit stated "[i]n other words, the hardware failure did not exist for more than four months after the work event and is not work related." Finally, the affidavit stated that Dr. Lovell held the opinion, "to a reasonable degree of medical certainty[] that [Employee's] symptoms were way more than 50% related to the failed fusion surgery that resulted in an incomplete fusion and is not related to the January 8, 2017 work event or any event occurring prior to April 27, 2017."

In a report of Employee's March 5, 2018 office visit with Dr. Camillo, the doctor stated, "[y]ou can see clearly he has a broken screw where we did the fusion," and noted, "[h]e did not have this on prior x-rays." The report addressed Dr. Camillo's opinion as to the cause of Employee's pain, his recommendation for additional surgery, and also stated:

> When I saw him in the office I discussed with him that I think his pain is definitely coming from the broken screw and the instability. Since this is broken[,] my plan would be to go in and remove the hardware, remove the screw and place bone down to get him a solid fusion. . . . Being that he was doing so well, I certainly think that this broken screw did come from his work injury.

Following the expedited hearing, the trial court concluded Employee established the occurrence of a specific incident that arose primarily out of his employment and presented medical evidence "that the incident 'contributed more than fifty percent (50%)' to his claimed disablement or need for medical treatment." Noting that medical evidence is not to be "read and evaluated in a vacuum," but must be considered "in conjunction with the lay testimony of the employee as to how the injury occurred and the employee's subsequent condition," the trial court found Employee to be credible and, irrespective of Dr. Lovell's causation opinion being entitled to a statutory presumption of correctness, determined "Dr. Camillo's opinion contains the more probable explanation." The trial court found Employee's testimony to be "consistent with Dr. Camillo's opinion" that the January 2017 incident "'fatigued' the screw, causing it to break." The trial court contrasted this evidence with Dr. Lovell's opinion, noting the doctor stated "'it is not clear' whether poor quality x-rays were to blame for not seeing a broken screw or

5

whether the screw broke between April and June [2017]." The trial court noted that although Dr. Lovell questioned whether the CT study was "good enough technically" to confirm a fusion, he indicated CT scans are "the best study" to show a fractured screw. The court stated that Dr. Lovell's opinion "cannot account for the uncontroverted testimony of [Employee] that he functioned without restriction until January 8 [2017]."

The trial court concluded Employee established he is likely to prevail at a hearing on the merits and ordered Employer to provide medical treatment for Employee's injury and to pay temporary partial disability benefits until Employee is released to full-duty or attains maximum medical improvement. Based on Dr. Lovell's recommendation that Employee "return to Dr. Camillo," the trial court designated Dr. Camillo as Employee's authorized treating physician. Employer has appealed.

## Standard of Review

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2017). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2017).

## Analysis

Employer identifies three issues on appeal, which we have combined and restated as whether the proof was sufficient to overcome the statutory presumption of correctness afforded to Dr. Lovell's causation opinion. *See* Tenn. Code Ann. § 50-6-102(14)(E) (2017).[2] Employer also contends the trial court erred in awarding additional medical benefits and in awarding temporary disability benefits. We conclude the trial court

---

[2] "The opinion of the treating physician, selected by the employee from the employer's designated panel of physicians pursuant to § 50-6-204(a)(3), shall be presumed correct on the issue of causation but this presumption shall be rebuttable by a preponderance of the evidence." Tenn. Code Ann. § 50-6-102(14)(E).

correctly determined that Dr. Lovell's causation opinion was rebutted by a preponderance of the evidence and that Employee established he would likely prevail at a hearing on the merits.

An injured worker has the burden of proof on every essential element of his or her claim. Tenn. Code Ann. § 50-6-239(c)(6). However, at an expedited hearing, an employee need not prove every element of his or her claim by a preponderance of the evidence but must come forward with sufficient evidence from which the trial court can determine that the employee is likely to prevail at a hearing on the merits consistent with Tennessee Code Annotated section 50-6-239(d)(1). *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). This lesser evidentiary standard "does not relieve an employee of the burden of producing evidence of an injury by accident that arose primarily out of and in the course and scope of employment at an expedited hearing, but allows some relief to be granted if that evidence does not rise to the level of a 'preponderance of the evidence.'" *Buchanan v. Carlex Glass Co.*, No. 2015-01-0012, 2015 TN Wrk. Comp. App. Bd. LEXIS 39, at *6 (Tenn. Workers' Comp. App. Bd. Sept. 29, 2015). In reviewing a trial court's conclusion that the evidence presented at an expedited hearing is sufficient to find an employee is likely to prevail at trial, we must presume the trial court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7). This necessarily requires that we weigh the evidence to determine where the preponderance lies.

It is undisputed that Employee was involved in a specific incident in the course and scope of his employment on January 8, 2017. What is disputed is whether the incident constitutes an injury by accident "arising primarily out of . . . the employment" that caused "disablement or the need for medical treatment" as contemplated in Tennessee Code Annotated section 50-6-102(14). For an injury to be accidental, it must be "caused by a specific incident, or set of incidents . . . and [must be] identifiable by time and place of occurrence." Tenn. Code Ann. § 50-6-102(14)(A). "An injury 'arises primarily out of and in the course and scope of employment' only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes." Tenn. Code Ann. § 50-6-102(14)(B). "An injury causes death, disablement or the need for medical treatment only if it has been shown to a reasonable degree of medical certainty that it contributed more than fifty percent (50%) in causing the death, disablement or need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14)(C).

Here, Dr. Lovell expressed his opinion concerning causation in a March 2018 affidavit, stating "to a reasonable degree of medical certainty, . . . [Employee's] symptoms were way more than 50% related to the failed fusion surgery that resulted in an incomplete fusion and is not related to the January 8, 2017 work event." This opinion is consistent with the statement in Dr. Lovell's April 27, 2017 report that "I just think way

more than 50% of his problem stems around a fibrous non-union from a surgery done eight years ago." Dr. Lovell's opinion on the issue of causation is presumed correct, but this presumption can be rebutted by a preponderance of the evidence. *See* Tenn. Code Ann. § 50-6-102(14)(E).

The trial court considered Dr. Lovell's opinion and contrasted it with Dr. Camillo's opinions that Employee's "pain is definitely coming from the broken screw and the instability" and that "this broken screw did come from his work injury." Dr. Camillo stated in his initial report that he believed when Employee was holding the patient "more than likely he fatigued the screw, and it broke, and now this is the increase in his pain." When faced with competing expert opinions, a "trial judge has the discretion to determine which testimony to accept." *Payne v. UPS*, No. M2013-02363-SC-R3-WC, 2014 Tenn. LEXIS 1112, at *18 (Tenn. Workers' Comp. Panel Dec. 30, 2014). In doing so, the trial court can consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Bass v. The Home Depot U.S.A., Inc.*, No. 2016-06-1038, 2017 TN Wrk. Comp. App. Bd. LEXIS 36, at *9 (Tenn. Workers' Comp. App. Bd. May 26, 2017).

The trial court noted Dr. Lovell's statement in his October 2, 2017 note that "[i]t is not clear" whether his previous studies "just weren't in correct focus or alignment to show this screw fracture," or if Employee "actually broke the screw after he saw [Dr. Lovell] and prior to seeing Dr. Camillo." The trial court also noted that Dr. Lovell "further assailed" the April 2017 CT scan he ordered as not being "good enough technically" to confirm whether Employee's spine at L5-S1 was fused, but nonetheless identified CT scans as being "the best study" to diagnose fractures in the vertebrae and to show a screw fracture. Based on the April 2017 CT scan not revealing a screw fracture, Dr. Lovell stated in his report, "I would go on the record suggesting that [Employee] did not have a broken screw when I saw [him] and that the screw fracture[d] between my clinic visit and Dr. Camillo's visit." Noting Dr. Lovell's statement that implanted screws in a patient who has a non-union of a fusion eventually break "for no reason [or] for any reason," the trial court concluded Dr. Lovell's opinion "cannot account for the uncontroverted testimony of [Employee] that he functioned without restriction until January 8 [2017]." Under these circumstances, we agree with the trial court's conclusion that Dr. Camillo's opinions, when considered in conjunction with Employee's testimony, rebutted Dr. Lovell's causation opinion. Moreover, we note that although Dr. Lovell indicated the CT scan did not show a broken screw, Dr. Camillo stated in his initial report that "[w]hen I review his CAT scan, it looks like he does have a broken screw down at L5-S1."

When a trial court has seen and heard witnesses, considerable deference must be afforded the trial court's factual findings. *Tryon v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn. 2008). Here, Employee was the only witness to testify at the expedited hearing.

8

His testimony as to how the incident occurred was unrefuted as was his testimony concerning the physical demands of his job and his ability to perform his job without difficulty prior to the January 8, 2017 incident. Likewise, his testimony that he completely recovered from his 2008 lumbar fusion was uncontroverted. The trial court concluded that Employee "credibly detailed the mechanics of the January 8 event and its immediate effects," noting he was "steady, forthcoming, and self-assured based on the Court's direct observation." The trial court stated that it "believe[d] [Employee's] uncontroverted testimony that he worked a physically demanding job until the January 8 incident disabled him." The trial court accredited both Employee's testimony and Dr. Camillo's opinions and concluded the preponderance of the evidence rebutted Dr. Lovell's causation opinion and established Employee would likely prevail at trial. The evidence does not preponderate against these conclusions.

Employer also asserts the trial court erred in determining Employee was entitled to additional medical benefits based upon the authorized treating physician, Dr. Lovell, concluding that Employee's injury was not work-related. Both Dr. Lovell and Dr. Camillo indicated further medical care was appropriate, but differed in their causation opinions. Having determined that the preponderance of the evidence rebutted the correctness of Dr. Lovell's causation opinion and that Employee established he would likely prevail at trial, we find no merit in Employer's insistence that the trial court erred in ordering additional medical benefits.[3]

Finally, Employer asserts the trial court erred in awarding temporary disability benefits to Employee "who was released to work by the [authorized treating physician] who also determined that Employee's injury did not arise primarily out of [the employment]." An injured worker may be entitled to temporary partial disability benefits when the temporary disability resulting from a work-related injury is not total. *See* Tenn. Code Ann. § 50-6-207(1)-(2) (2017). "Temporary partial disability refers to the time, if any, during which the injured employee is able to resume some gainful employment but has not reached maximum recovery." *Hackney v. Integrity Staffing Solutions, Inc.*, No. 2016-01-0091, 2016 TN Wrk. Comp. App. Bd. LEXIS 29, at *11 (Tenn. Workers' Comp. App. Bd. July 22, 2016). Here, as of the April 27, 2017 date of Employee's last visit with Dr. Lovell, Employee's light-duty restrictions were continued. Noting that Employee "testified without rebuttal that [Employer] ceased accommodating his restrictions after Dr. Lovell" opined Employee's injury was not work-related, the trial court awarded temporary partial disability benefits from the date of Employer's denial "until now and ongoing," or until Employee is released to work or attains maximum

---

[3] Employer has not presented any issue concerning the trial court's designation of Dr. Camillo as the authorized treating physician, and we accordingly do not address that issue.

medical improvement.  We conclude that the preponderance of the evidence supports the trial court's award of temporary partial disability benefits.[4]

## Conclusion

For the foregoing reasons, we hold the preponderance of the evidence supports the trial court's conclusion that Employee rebutted Dr. Lovell's causation opinion and that Employee would likely prevail at trial.  We further hold that the evidence supports the trial court's determination to award Employee additional medical benefits and temporary partial disability benefits.  Accordingly, the trial court's order is affirmed and the case is remanded.

---

[4] Employer does not dispute the amount awarded by the trial court, and we accordingly do not address the amount of temporary partial disability benefits awarded.